# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **CHRIS BAKER,** *et al.,* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )     **CIVIL ACTION 10-0307-WS-B** |
| | ) |
| **RBS WORLDPAY, INC.,** *et al.,* | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

This matter comes before the Court on defendants' Motion for Summary Judgment (doc. 56). The Motion has been extensively briefed and is now ripe for disposition.

**I.**     **Relevant Factual Background.**[1]

    *A.*     ***Plaintiffs' Employment and the Compensation Agreement.***

At its core, this action concerns a dispute over unpaid commissions. Plaintiffs Chris Baker, Richard Batto, and Chris McMeekin were employed at all relevant times by defendants RBS WorldPay, Inc. ("WorldPay"), Royal Bank of Scotland, plc ("RBS"), and Citizens Financial Group, Inc. ("Citizens"). (Doc. 56, at 3; doc. 63, at 1.)[2] In particular, Baker, Batto and

---

[1]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party, resolving all reasonable doubts about the facts in favor of the non-movant. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiffs' evidence is taken as true and all justifiable inferences from the record are drawn in their favor.

[2]     In some respects, this is an oversimplification. After all, the parties' filings detail how plaintiffs' employing entity or entities changed names at various times through mergers and other corporate transactions, and set forth the interlocking relationships among WorldPay, RBS, and Citizens. (Doc. 56, at 2-3 & n.1; doc. 63, at 1-3 & n.1.) It is unnecessary to wade through such minutiae inasmuch as both sides concede that plaintiffs were employed by defendants at all relevant times, and do not distinguish among either the different defendants or those defendants' predecessors. (Doc. 56, at 3 ("Plaintiffs were employed with Defendants from 2004 to September 21, 2009."); doc. 57, at 1 (Baker, Batto and McMeekin "were each employed by Defendants").) For purposes of this Order, then, defendants collectively will be considered to be
(Continued)

McMeekin worked for WorldPay as salesmen (also called "national account executives"), selling petroleum payments processing services to merchants across the United States. (Doc. 56, at 3; doc. 63, at 3.) In this capacity, plaintiffs' duties were to sell credit card processing services to unbranded petroleum marketers (*i.e.*, independent gas stations). (Baker Dep., at 21-24.) Defendants terminated plaintiffs' employment on September 21, 2009. (Minor Decl. (doc. 58, Exh. 10), ¶¶ 6-7; McMeekin Dep., at 95.)[3]

It is undisputed that at the time of their discharge, each plaintiff was subject to the terms of an agreement styled "Citizens Financial Group, Inc., RBS Lynk National Business Group, 2008 Sales Compensation Plan Guidelines, National Account Executive" (hereinafter, the "Compensation Agreement"). (Doc. 56, at 3; doc. 63, at 4.)[4] This lawsuit centers on plaintiffs' contention that defendants breached the Compensation Agreement; therefore, certain terms of that contract warrant close inspection.

The Compensation Agreement reflects that plaintiffs "will have the opportunity to earn a significant level of variable pay" and that WorldPay expects them "to sell new business in [their] territory and to maximize achieved Gross Margin." (Doc. 58, Exh. 12, at 2.) Notably, the contract specifies that if any plaintiff's employment is terminated after 60 months of continuous employment, he would continue receiving so-called residual commission payments at 50% of the ordinary rate "for as long as (1) applicable merchants continue to be a RBS customer; (2) RBS determines that the colleague has complied or is incompliance [*sic*] with his or her obligations

---

plaintiffs' employer, and may be referred to via the shorthand of "WorldPay." The Court recognizes, however, that plaintiffs worked for a predecessor to WorldPay for some period of time prior to the fall of 2009.

[3] The cited Declaration actually states that plaintiffs' employment was terminated on September 21, 2011. (Minor Decl., ¶ 6.) This is obviously a typographical error given that said Declaration was executed on June 29, 2011, and plaintiffs filed the Complaint concerning post-termination commissions back in June 2010.

[4] On its face, it appears paradoxical that the parties' compensation rights and obligations as of plaintiffs' September 2009 dismissal were governed by a document styled "2008 Sales Compensation Plan Guidelines." Nonetheless, the summary judgment record confirms that such is the case, as defendants extended the terms of that Compensation Agreement to embrace calendar years 2009 and 2010, as well. (Grant Dep., at 134-35.)

under the Program; and (3) the total monthly Residual does not fall below one hundred dollars."
(*Id.* at 4.)  The contract goes on to state that "[i]f RBS Lynk determines in its sole discretion that
any one or more of these conditions is not met, RBS Lynk payment obligations shall cease."
(*Id.*)  The potential, then, existed that after separation from defendants' employ, plaintiffs could
continue receiving residual commissions for life, as long as the applicable merchants remained
customers of WorldPay and the other conditions were satisfied.

The Compensation Agreement also includes specific provisions voiding defendants'
residual commission payment obligations in the event that an employee is terminated for cause.
Indeed, the contract provides that "[p]lan participants who are terminated for cause immediately
forfeit all earned or unearned awards where permitted by law."  (*Id.* at 9.)  "Cause" is a defined
term in the Agreement, encompassing in relevant part "[t]he commission of any fraud,
misappropriation, embezzlement or other dishonest act that RBS Lynk and CFG has deemed a
breach of Citizens' Code of Ethics or the Royal Bank of Scotland's Code of Conduct or may
reasonably be expected to have injurious effect on the Company," as well as "[c]onduct that may
reasonably be expected to have a material adverse effect on the financial interest or business
reputation of the Company."  (*Id.* at 9-10.)[5]  A choice of law provision reflects that the
Compensation Agreement "shall be governed by and construed in accordance with the laws of
the state of Rhode Island."  (*Id.* at 11.)

**B.      The PMAA Agreement.**

Among plaintiffs' claims in this action is an assertion that defendants breached the
Compensation Agreement in April 2009 (several months prior to plaintiffs' discharge) by
entering into a Customer Referral Agreement with nonparty Petroleum Marketers Association of
America (the "PMAA Agreement").  The effect of the PMAA Agreement was to allow members
of the PMAA to request from WorldPay a per-transaction fee of $0.045, which was a

---

[5]      The Compensation Agreement clarifies that the "cause" provisions do not alter
the at-will nature of plaintiffs' employment or impair defendants' ability to terminate such
employment at any time and for any reason.  (*Id.* at 10.)  The issue in this case is not whether
defendants had the right to fire plaintiffs, but whether defendants were obligated to pay them
residual commissions thereafter.

substantially lower rate than that extended to many existing customers.  (Finnigan Dep., at Exh. 5, ¶ 4; Fisher Dep., at 22-24; Baker Dep., at 101.)[6]

Plaintiffs were dismayed by the PMAA Agreement because it made available a 4.5-cent transaction rate for plaintiffs' customer base, "our customers that I was getting on an average – on a daily basis at ten cents.  So they, unknown to us, negotiated a deal that represented … essentially every convenience store in the country and gave them the opportunity to take advantage of a deal at four-and-a-half cents where I was going to them in the same company at ten cents."  (Baker Dep., at 101-02.)  Plaintiff McMeekin cut to the chase by explaining that "by entering into the PMAA contract at a reduced rate and going out to a very large group of people, it was not going to allow me to maximize my compensation."  (McMeekin Dep., at 51.)  The PMAA Agreement "kept us from making the amount of money that we possibly could without it."  (*Id.* at 53.)  In plaintiffs' view, the PMAA Agreement was better for the customer (which would be able to lower its transactional costs by availing itself of the 4.5-cent fee), but worse for plaintiffs (because their commissions may be adversely affected).  (Baker Dep., at 125.)

Employees, including plaintiffs, complained to WorldPay about the PMAA Agreement. Indeed, "[c]ollectively, the petroleum group … had voiced its strong opposition to what they had done to the petroleum group as a result of the PMAA agreement."  (*Id.* at 140.)  Gary Grant, defendants' Vice President of Sales and plaintiffs' supervisor, acknowledges that plaintiffs expressed unhappiness about this contract, and that he told them "they were way off base." (Grant Dep., at 89.)  Grant further advised plaintiffs that if they did not embrace the PMAA deal, then he would find someone else.  (Baker Dep., at 141.)

### C.    *The Wright Express Application Form Issue.*

Nonparty Wright Express is an over-the-road fleet card processor providing credit cards as an alternative to the major bank cards (*i.e.*, MasterCard, Visa, American Express, Discover). (Grant Dep., at 117-18.)  WorldPay offered Wright Express card processing services to its

---

[6]    As plaintiffs' supervisor Gary Grant explained, the purpose of the PMAA Agreement was to "open the pie," enabling WorldPay to increase market share by accessing new customers that belong to the PMAA, many of which plaintiffs realistically would not otherwise have been able to call on given their numerosity and the vastness of the territory involved. (Grant Dep., at 94-95.)  Thus, the PMAA Agreement "increased market share or our ability to attack market share," and thereby was designed to advance WorldPay's financial and business interests, despite the uncharacteristically low fixed transactional fee.  (*Id.* at 95.)

merchant customers as part of a servicing package. Customers wishing to avail themselves of this service were required to submit a separate Wright Express Merchant Charge Card Agreement Application, which Wright Express had discretion to approve or reject. (Batto Dep., at 26-27.) In their capacity as account executives, plaintiffs were responsible for collecting these applications and delivering same to Wright Express for approval. (Baker Dep., at 134-35.)

Above the merchant's signature block on the application form was a statement in which the signatory: (i) represented and warranted "that all of the terms and conditions of the Wright Express Merchant Charge Card Agreement Application … including the Wright Express Merchant Charge Card Agreement have been reviewed in their entirety, are true and correct, and set forth the agreement between Wright Express and Merchant"; and (ii) represented and warranted that he "has authority to sign and to bind Merchant to the terms of this Application." (Doc. 58, Exh. 14, at 2.)[7] There is no indication and no record evidence that Wright Express required merchants to sign additional documents or agreements upon accepting their applications; rather, the application form itself appears to be the document binding the merchant to the terms of the Wright Express Merchant Charge Card Agreement, and otherwise establishing the terms of the merchant's business relationship with Wright Express.

On June 17, 2009, Wright Express reported an unsettling discovery to WorldPay: numerous applications from various WorldPay merchants featured what appeared to be the same handwriting and signature style. (Doc. 58, Exh. 11, at 1.)[8] Wright Express's correspondence to WorldPay expressed alarm, noting that this revelation was "extremely concerning as these are legally binding documents." (*Id.*)[9] In response, WorldPay launched an internal investigation

---

[7]     The application form also included statements that the signatory merchant represented the completeness and accuracy of information contained in the application, authorized Wright Express to check with credit reporting agencies and other sources to confirm it, and agreed to the terms and conditions of the Wright Express Merchant Charge Card Agreement. (*Id.* at 1.)

[8]     Specifically, Wright Express complained to WorldPay in writing that "[m]any of the applications, although coming from entirely different entities, bear the same handwriting and appear to be signed by the same person. Preliminary review has uncovered 18 different fuel site applications dating back to January of this year." (*Id.*)

[9]     That said, nowhere in this correspondence did Wright Express expressly "indicate[] that its business relationship with WorldPay could be affected" by these events. (Continued)

into the Wright Express application matter.  Pursuant to that investigation, defendants reviewed

numerous Wright Express application forms, which revealed that Baker, Batto and McMeekin

had all repeatedly completed and signed such forms for merchants, without notifying WorldPay

or Wright Express that they (rather than the merchants themselves) were the ones signing those

applications.  (Hunt Dep., Exh. 1, at 1-2.)[10]  Defendants also confirmed that Grant had never

authorized plaintiffs to engage in this practice.  (Hunt Dep., at 96-97; Grant Dep., at 127.)  When

defendants confronted plaintiffs, all three of them candidly acknowledged that they had

completed the application forms and signed them for the merchants.  (Hunt Dep., Exh. 1, at 1-

2.)[11]  They further stated that they had followed this practice for years, and that they did so with

the merchants' permission as a convenience for those merchants.  (*Id.*; Batto Dep., at 56; Baker

---

(Doc. 56, at 11.)  As such, defendants' repeated citation to that correspondence in support of that proposition takes liberties with the exhibit that do not appear supported by its text.  Nonetheless, Wright Express's discontent shines through elsewhere in the record.  Donald Hunt, WorldPay's head of security, reported based on his conversations with Wright Express that "[i]t seemed clear that our future relationship with Wright Express was in jeopardy."  (Hunt Dep., Exh. 1, at 1.)  Moreover, Hunt's report recites Wright Express's determination that it would no longer accept <u>any</u> deals from plaintiff Batto (the account executive for whom the problem was first discovered) and that it did not want Batto involved in remediation efforts for the affected merchants.  (*Id.*)  Such a hostile reaction underscores Wright Express's belief that it had been duped, and that plaintiffs were to blame.

[10]      Such conduct was neither isolated nor infrequent.  One plaintiff estimated that he may have signed merchants' names for "over 5,000 customers."  (Batto Dep., at 28.)  And defendants concluded that plaintiffs had engaged in such conduct at the rate of "hundreds of contracts every year."  (Finnigan Dep., at 73-74.)

[11]      By signing "for the merchants," plaintiffs were actually signing the merchant's name to the application, with nothing to indicate that plaintiffs were the ones doing the signing with the merchant's permission.  They simply filled in the customer's name, signing it as if they were the merchant, with no notation or addendum explaining who the true signatory was or how plaintiffs came to sign as the merchant.  (McMeekin Dep., at 42; Batto Dep., at 30, 38; Baker Dep., at 37-38, 137.)  For example, on a sample application in the record, a merchant called Bukhari Holdings, LLC applied for Wright Express services.  The application was evidently signed by one of the plaintiffs, who simply affixed the signature "Sayed Bukhari."  (Doc. 58, Exh. 14.)

Dep., at 130; McMeekin Dep., at 94.)[12]  Defendants' investigating official, Donald Hunt, believed that all three plaintiffs responded honestly when questioned about this issue.  (Hunt Dep., at 97-98, 113-14.)  Hunt also assured plaintiffs not to worry about it, but to refrain from signing any more applications for merchants.  (Batto Dep., at 39-40, 56; McMeekin Dep., at 94.)  Plaintiffs complied.[13]

### D. Termination of Plaintiffs' Employment.

On September 21, 2009, defendants contacted each plaintiff telephonically and notified him that his employment with WorldPay was being terminated for cause.  (Minor Decl., ¶ 6.)

Defendants' position is that their sole reason for discharging plaintiffs was the Wright Express application form issue documented *supra*.  Record evidence shows that Helen Finnigan, then RBS's Regional Head of Policy and Employment for the Americas region, actually made the decision to terminate plaintiffs' employment.  (Finnigan Dep., at 6, 82-83.)[14]  Finnigan determined that plaintiffs' employment should be terminated for violations of the Code of Conduct.  (*Id.* at 83.)[15]  According to Finnigan, she reached this decision after being apprised of the Wright Express issue and obtaining detailed information concerning defendants' ensuing

---

[12]    According to plaintiffs, they were simply following what they termed "accepted procedures" from their employment with predecessor entities to WorldPay.  (Batto Dep., at 27-28; Baker Dep., at 37.)

[13]    On June 23, 2009, plaintiffs' supervisor, Grant, sent an email to all of them stating, among other things, the following: "YOU MAY NOT SIGN THE APPLICATIONS EVEN IF YOU ARE GIVEN PERMISSION. … By signing someone else's name you are committing a felony and you are putting RBS WorldPay in major harms way and legal risk."  (Hunt Dep., at Exh. 3.)  There is no evidence that plaintiffs ever violated this June 23 directive after it was administered.

[14]    Finnigan explained that, in her position for RBS, "every termination in the Americas would come through [her], so that [RBS] could insure a consistent application of policies, procedures, and decisions."  (*Id.* at 42.)  Indeed, WorldPay human resources or other officials could not terminate plaintiffs' employment without Finnigan's involvement.  (*Id.*)

[15]    The "Code of Conduct" referenced by Finnigan was a document styled "Citizens Financial Group, Inc. Code of Ethics."  (Finnigan Dep., at Exh. 2.)  The portions of this Code that Finnigan found plaintiffs had violated included provisions requiring employees to conduct business activities "with the highest standard of integrity and professionalism," and specifying that "falsification of any record, account or document may result in immediate dismissal."  (Finnigan Dep., at 51-52 & Exh. 2 at ¶¶ 8, 14.)

investigation.  (*Id.* at 38-40.)  She specifically understood that plaintiffs had been signing paperwork on behalf of the merchants, that they said they had the merchants' permission to do so, that Wright Express had not authorized plaintiffs to sign for the merchants, and that Wright Express was "quite unhappy that this had happened."  (*Id.* at 40-41.)  Finnigan elected to terminate plaintiffs' employment, rather than meting out lesser discipline such as a warning (although she considered such alternatives), because "they had had training.  They had signed the agreement.  They had acknowledged that they, in fact, signed somebody else's name that was the basis that I determined it was a terminable offense."  (*Id.* at 49.)  Finnigan elaborated on her reasoning that "Wright Express … objected to behaviors that were taking place.  They wanted [plaintiffs] off their account … and it was a professional – it was a reputational issue for RBS, that our client believed that our employees were acting inconsistent with what they had set as their processes."  (*Id.* at 58.)  Finnigan also stated that "signing somebody else's signature to another company's documents, to me is obvious" that employees should not engage in such behavior.  (*Id.* at 61.)

By contrast, plaintiffs' position is that the real reason they were fired had nothing to do with the Wright Express issue, but was instead that plaintiffs had complained about the PMAA Agreement as well as "defendants' unethical and company-wide overcharging of customers." (Doc. 63, at 5; Batto Dep., at 72; Baker Dep., at 139-40.)  Plaintiffs' dissatisfaction with the adverse effects of the PMAA Agreement has been discussed *supra*.  As for the alleged "overcharging" issue, the record shows that at all relevant times, defendants utilized a billing system that could not accommodate fractional pricing (*i.e.*, transaction fees in partial pennies, such as $0.045 per transaction), so it rounded up if the third decimal place was a 5 or above, and rounded down if it was a 4 or below.  (Martin Dep., at 32-33.)[16]  Plaintiffs' evidence is that they

_____

[16]     Plaintiffs inaccurately characterize this system as one in which defendants "would round the charge per transaction up to the next whole cent," suggesting that rounding was done for each individual transaction.  (Doc. 63, at 5.)  The record is clear that any rounding was performed at the batch level, not the individual transaction level.  (Martin Dep., at 33, 90; Batto Dep., at 68-69; Ward Dep., at 27.)  In other words, if the agreed-upon fee was $0.045 per transaction, WorldPay's system would not round up the cost of every transaction to 5 cents; rather, it would do so only for the last transaction, and then only if there were an odd number of transactions in the batch.  For example, if there were 100 transactions at the $0.045 rate, the customer would properly be charged $4.50.  If there were 101 transactions, the customer would be charged 5 cents for that last charge because of rounding, for a total charge of $4.55.  It is (Continued)

-8-

objected to defendants repeatedly about this "rounding" system beginning in 2008, or approximately a year before their termination. (Batto Dep., at 69, 72; Baker Dep., at 149-51; McMeekin Dep., at 69-71; Gunderson Dep., at 28.) According to plaintiffs, defendants took no meaningful corrective action, and essentially instructed plaintiffs to "leave it alone" because it would be "very, very difficult" for WorldPay to correct the problem. (McMeekin Dep., at 82-83; Batto Dep., at 71-72.)[17]

Whatever the reasons for Finnigan's decision may have been, it is uncontroverted that she possessed no information at that time concerning three specific areas. First, Finnigan did not review plaintiffs' compensation package in connection with her termination decision and did not know at that time whether their termination would affect their compensation package and, more precisely, their entitlement to residual commissions. (Finnigan Dep., at 82-84.) Second, Finnigan testified that she was unaware of any fractional pricing / rounding controversies for WorldPay merchants in the petroleum sales division and that she had no information that plaintiffs had ever complained about that issue prior to their dismissal. (*Id.* at 97-98, 101.) Third, she had also never heard of the PMAA Agreement. (*Id.* at 102.)

The decision to designate plaintiffs' termination as "for cause" for purposes of the Compensation Agreement was not made by Finnigan. (Finnigan Dep., at 83-86.)[18] Nor was it

---

unclear how large a "batch" is or what time period a "batch" would cover for a typical WorldPay customer during the time period at issue.

[17] That said, it is undisputed that defendants offered certain remedies to mitigate adverse effects of their billing system limitations vis a vis fractional pricing. If any customer balked about billing discrepancies caused by this rounding issue, defendants would "true up" those accounts on a monthly basis to ensure no overcharging. (Baker Dep., at 150-51; McMeekin Dep., at 69-72.) Plaintiffs also acknowledge that they could have priced transactions at 4/10 of a penny rather than 5/10, so that defendants' system would round down, rather than up, and that Grant had advised them to do just that on occasion. (McMeekin Dep., at 67, 84.) In plaintiffs' view, these measures were inadequate to rectify the situation.

[18] This only makes sense. If Finnigan did not review the Compensation Agreement and did not study plaintiffs' compensation package before making her decision, she could not have known whether the reasons for plaintiffs' termination satisfied or did not satisfy the specific definition of "cause" prescribed by that Agreement. In any event, given Finnigan's clear testimony that she did not make any determination as to whether plaintiffs' discharge was "for (Continued)

Gary Grant's decision; indeed, his testimony was that he was "out of the loop" in the termination decision, and that he was told on the morning of September 23 to terminate plaintiffs' employment and to inform them that such termination was "for cause," without identifying what that "cause" was. (Grant Dep., at 125, 132-33.) By all appearances, the WorldPay official who found plaintiffs' discharge to be "for cause" was Tiwana Minor, a vice president in human resources. (Minor Decl., ¶ 6.) Minor's reasoning was that "[t]he termination would be 'for cause' as it was for a violation of the Code of Ethics." (*Id.*)

Because defendants characterized plaintiffs' terminations as for cause, no plaintiff has received post-termination residual commissions as specified in the Compensation Agreement. Plaintiffs' evidence is that, had such residuals been paid at the contractual post-termination rate of 50%, plaintiffs would be receiving steady monthly checks from defendants in the approximate range of $1,000 - $3,500 for every month from October 2009 through January 2011, and continuing on indefinitely thereafter. (Holm Dep., at Exh. 2.)

      **E.**       ***Plaintiffs' Claims in this Action.***

Based on the foregoing facts and circumstances, Batto, Baker and McMeekin collectively filed a Complaint (doc. 1) against defendants in this District Court.[19] The centerpiece of the Complaint is a cause of action for breach of contract, wherein plaintiffs allege that defendants breached the Compensation Agreement in the following ways: (i) by executing the PMAA Agreement (thereby allowing customers to reduce transaction fees and inhibiting plaintiffs' efforts to sell new business and maximize gross margin); (ii) by failing "to pay Plaintiffs the proper amount of commission due under the terms of their Compensation Agreement during the entire term of their employment"; and (iii) by failing to pay residual commissions to plaintiffs

_____

cause" or not, defendants' statements in their reply brief that Finnigan made a "cause" determination under the Compensation Agreement will not be credited. (*See* doc. 67, at 8-10.)

    [19] Federal subject-matter jurisdiction was properly predicated on 28 U.S.C. § 1332, inasmuch as the Complaint pled that there was complete diversity of citizenship between plaintiffs and defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs. (Doc. 1, ¶¶ 2-5.) The Court is aware of no facts or circumstances that call into question either of the § 1332 jurisdictional requirements in this case.

after terminating their employment.  (Doc. 1, ¶ 27.)[20]  Plaintiffs also assert common-law claims of conversion and unjust enrichment.  (*Id.*, ¶¶ 30-32, 34-35.)  On their face, these conversion and unjust enrichment causes of action rest wholly on the notion that defendants have withheld commission payments that are otherwise due and owing to plaintiffs; therefore, these claims can survive summary judgment only if the underlying breach of contract claim does.

## II.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual

---

[20]    During the course of this litigation, plaintiffs have abandoned the second of these breach-of-contract arguments.  Plaintiffs' summary judgment brief confirms that they "concede they were paid the commission owed to them during the term of their employment."  (Doc. 63, at 19 n.5)  In deposition testimony, two plaintiffs disclaimed any allegation that defendants failed to pay them commissions owed during their terms of employment.  (Baker Dep., at 126, 169; Batto Dep., at 62.)  The third plaintiff denied having information or evidence that he was owed any commissions for his term of employment with defendants.  (McMeekin Dep., at 55-56.)  In light of these admissions and concessions, defendants' Motion for Summary Judgment is **granted** as to the portion of the breach of contract claim alleging that "Defendants failed to pay Plaintiffs the proper amount of commissions due under the terms of their Compensation Agreement during the entire term of their employment."  (Doc. 1, ¶ 27.)  This claim is **dismissed**.

determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III.    Analysis.

As indicated, plaintiffs maintain that defendants breached the Compensation Agreement by executing the PMAA Agreement and by refusing to pay them post-termination residual commissions that were due and owing. Plaintiffs also seek to recover those unpaid commissions on separate theories of conversion and unjust enrichment. The undersigned will consider each claim in turn.

### A.    *Breach of Contract Claim Relating to PMAA Agreement.*

The first aspect of plaintiffs' breach of contract cause of action is an allegation that defendants breached the Compensation Agreement by entering into the PMAA Agreement.[21] Plaintiffs' theory is that the PMAA Agreement breached the Compensation Agreement by enabling WorldPay customers to obtain more favorable pricing than plaintiffs had granted them, thereby impinging on plaintiffs' "obligations to maintain their gross margins under the [Compensation] Agreement." (Doc. 63, at 26.) Plaintiffs further complain that "by execution of the PMAA [Agreement] Defendants effectively eliminated Plaintiffs' ability to meet their contract 'obligations' under the Compensation Agreement." (*Id.* at 27.)

Defendants correctly point out that a threshold defect in this claim is that plaintiffs cannot identify any express term of the Compensation Agreement that was breached by WorldPay's execution of the PMAA Agreement. To be sure, plaintiffs rely heavily on a statement in the Compensation Agreement that "[y]ou will have the opportunity to earn a significant level of

---

[21]    Under Alabama law, "[t]o establish a breach of contract claim, a plaintiff must prove: (1) the existence of a valid contract binding the parties in the action, (2) [his] own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Ex parte American Heritage Life Ins. Co.*, 46 So.3d 474, 477 (Ala. 2010) (citations and internal quotation marks omitted). Plaintiffs suggest that Rhode Island law governs the Compensation Agreement pursuant to a choice-of-law provision therein. The elements of this claim are not materially different under Rhode Island law. *See, e.g., Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2010) ("To succeed on a breach of contract claim under Rhode Island law, a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff.") (citations and footnote omitted); *Gorman v. St. Raphael Academy*, 853 A.2d 28, 37 (R.I. 2004) ("the burden of proof in a breach of contract action rests with a plaintiff to show that a defendant breached the contract").

variable pay" in the form of commissions for new customers and recurring residual payments for retained accounts. (Doc. 58, Exh. 12, at 2.) Plaintiffs also rely on contractual language that "[w]e expect you to sell new business your territory and to maximize achieved Gross Margin." (*Id.*) According to plaintiffs, the PMAA Agreement breaches these terms by reducing achievable gross margins and variable pay for national account executives whose customers now have access to the lower PMAA rate.

Plaintiffs read far more into these terms of the Compensation Agreement than the language itself can reasonably support. Nowhere did defendants promise to refrain from taking action that might have a deleterious effect on plaintiffs' total commissions and residuals.[22] Nor can the quoted language be reasonably construed as imposing ironclad draconian limitations on defendants' ability to operate their business as they see fit.[23] A mere statement that plaintiffs would have an opportunity to earn significant levels of variable pay is not tantamount to a promise that the company will refrain from taking any action of any kind that might reduce that level of variable pay (even if that action would promote defendants' business, swell its customer base, and increase market share). Nor does a statement that WorldPay expects employees "to sell new business" and "to maximize achieved Gross Margin" obligate or prohibit defendants

---

[22]     Plaintiff Batto effectively admitted as much, by testifying that he could not identify anything in the Compensation Agreement that would preclude WorldPay from entering into the PMAA Agreement. (Batto Dep., at 61-62.)

[23]     Plaintiffs' argument suffers from a classic "slippery slope" problem. If plaintiffs were correct that the PMAA Agreement breaches the Compensation Agreement by adversely affecting plaintiffs' ability to earn variable pay, then any action by defendants with such a negative effect would likewise violate that Agreement. For example, defendants would be unable to hire new account executives, reassign customers, or alter sales territories without breaching the Compensation Agreement. Instead, WorldPay would be obligated to orient every business decision it makes to promote the single-minded, overriding objective of maximizing plaintiffs' variable pay. That stance obviously cannot withstand scrutiny. Even plaintiffs admit that such a broad limitation on defendants' business discretion is not supported by the contractual language. In that regard, plaintiff McMeekin conceded that defendants could hire new account executives, change his territory, increase his sales goals, and reassign his customers to other employees, all without asking his permission. (McMeekin Dep., at 38-39, 43, 61-62.) Plaintiffs Batto and Baker made similar admissions. (Batto Dep., at 47-48; Baker Dep., at 123-24.) If plaintiffs agree that WorldPay could take these actions (a natural consequence of which might be reduction in their variable pay), why do they contend that the PMAA Agreement is different? Plaintiffs have not provided a good answer.

from doing anything.  By advocating a wholesale redrafting / reimagining of these unremarkable contract provisions, plaintiffs would do violence to bedrock principles of contract construction. Under both Alabama and Rhode Island law, contract terms must be read and construed in accordance with their plain meaning.  *See, e.g., Chris Myers Pontiac-GMC, Inc. v. Perot*, 991 So.2d 1281, 1284 (Ala. 2008) ("a court should give the terms of the contract their clear and plain meaning and should presume that the parties intended to do what the terms of the agreement clearly state"); *Cathay Cathay, Inc. v. Vindalu, LLC*, 962 A.2d 740, 746 (R.I. 2009) (if contract language is "clear and unambiguous, words contained therein will be given their usual and ordinary meaning and the parties will be bound by such meaning") (citations omitted). Furthermore, this Court "may not make a new contract for the parties or rewrite their contract under the guise of construing it."  *Public Bldg. Authority of City of Huntsville v. St. Paul Fire and Marine Ins. Co.*, --- So.3d ----, 2010 WL 3937962, *8 (Ala. Oct. 8, 2010) (citations omitted); *see also Title Max of Birmingham, Inc. v. Edwards*, 973 So.2d 1050, 1055 n.1 (Ala. 2007) ("It is not a function of the courts to make new contracts for the parties, or raise doubts where none exist.") (citations omitted); *Papudesu v. Medical Malpractice Joint Underwriting Ass'n of Rhode Island*, 18 A.3d 495, 499 (R.I. 2011) ("[w]e decline to read nonexistent terms or limitations into a contract") (citation omitted).

Because the plain, unambiguous language of the Compensation Agreement does not forbid WorldPay from acting in any manner that might reduce plaintiffs' variable pay opportunities or impact their achievable gross margin, plaintiffs' attempt to frame the PMAA Agreement as a breach of that Compensation Agreement on the grounds that their variable pay might decline or their gross margins might fall is meritless as a matter of law.[24]

---

[24]     The precise wording of the Compensation Agreement is that plaintiffs "will have the opportunity to earn a significant level of variable pay."  (Doc. 58, Exh. 12, at 2.)  Even after the PMAA Agreement was signed, plaintiffs continued to enjoy "the opportunity to earn a significant level of variable pay."  In that regard, the record shows that, as of today, the PMAA Agreement applies only to merchants in nine states, current customers were exempted, merchants received the PMAA rate only on request, and merchants with five or more locations were referred to salespersons such as plaintiffs so that the account executives would obtain new business (on which they would earn variable pay and help achieve personal performance goals). (Fisher Dep., at 21, 81, 90-91; Grant Dep., at 84, 96.)  If anything, the PMAA Agreement created opportunities for variable pay for national account executives at WorldPay because it was structured to give plaintiffs "an opportunity to still cash in on the deal, get commission and (Continued)

In the alternative, plaintiffs argue that defendants' execution of the PMAA Agreement amounts to a breach of the implied covenant of good faith and fair dealing. Under applicable law, every contract contains such an implied covenant of good faith and fair dealing.[25] But plaintiffs do not explain how defendants' act of entering into the PMAA Agreement implicates that covenant. There is no evidence that the PMAA Agreement destroyed plaintiffs' ability to receive the fruits of the Compensation Agreement (*i.e.*, "a significant level of variable pay"). Nor can the PMAA Agreement reasonably be characterized as the product of bad faith or unfair conduct by defendants, who were after all attempting to increase WorldPay's market share by offering more merchant-friendly pricing, all the while preserving opportunities for plaintiffs to earn variable pay. There is no evidence, nor even insinuation by plaintiffs, that WorldPay entered into the PMAA Agreement for the sinister purpose of extinguishing commission opportunities for national account executives. In any event, given the limited reach of the PMAA Agreement during the period of plaintiffs' employment, there is no reason to believe that it materially injured plaintiffs' ability to earn variable pay during the period in which the Compensation Agreement was in effect.[26] On this showing, no reasonable fact finder could

---

residuals" (Fisher Dep., at 90) from customers that they otherwise never could have reached. That plaintiffs might not have been able to "cash in on the deal" to the extent they would have liked cannot rationally translate into a finding that plaintiffs' opportunities for variable pay had evaporated with the signing of the PMAA Agreement. On the strength of this undisputed evidence, the real-world, short-term effect of the PMAA Agreement on plaintiffs' actual "opportunity to earn a significant level of variable pay" appears minor, and abundant opportunities for such variable pay remained. Plaintiffs offer no evidence that their variable pay plummeted (or even declined at all) between the signing of the PMAA Agreement and their separation from WorldPay in September 2009.

[25]     *See, e.g., Shoney's LLC v. MAC East, LLC*, 27 So.3d 1216, 1220 n.5 (Ala. 2009) ("There is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the rights of another party to receive the fruits of the contract; … in every contract there exists an implied covenant of good faith and fair dealing.") (citations omitted); *Dovenmuehle Mortg., Inc. v. Antonelli*, 790 A.2d 1113, 1115 (R.I. 2002) ("Virtually every contract contains an implied covenant of good faith and fair dealing between the parties.") (citations omitted).

[26]     In this regard, it is important to remember that the Compensation Agreement was initially in effect for only a one-year term spanning from January 1, 2008 to December 31, 2008, but was renewed by WorldPay for the 2009 calendar year. Plaintiffs have adduced no evidence – (Continued)

conclude that defendants' execution of the PMAA Agreement ran afoul of the implied covenant of good faith and fair dealing owed to plaintiffs pursuant to the Compensation Agreement.

For all of these reasons, defendants are entitled to summary judgment on plaintiffs' breach of contract claim predicated on allegations that execution of the PMAA Agreement breached express or implied terms in the Compensation Agreement.

### B.    *Breach of Contract Claim Relating to Post-Termination Commissions.*

The remaining portion of the breach of contract claim, and the focal point of this litigation, is plaintiffs' claim that defendants breached the Compensation Agreement by failing to pay them post-termination residual commissions.  That Agreement obligated defendants to continue paying residuals to plaintiffs following the termination of their employment at 50% of the normal rate for so long as the applicable merchants remained WorldPay customers, the employee complied with his obligations, and the total monthly residual exceeded $100.  There was an important exclusion, however.  By the clear terms of the contract, employees were disqualified from receiving post-termination residuals if their termination was "for cause," as that term is defined in the Compensation Agreement.  Defendants insist that plaintiffs were fired for cause.  Plaintiffs are likewise emphatic that their discharge was without cause.  Thus, the critical issue on which the breach of contract claim hinges is whether or not plaintiffs' termination was "for cause" within the meaning of that term in the Compensation Agreement.[27]

---

and indeed have not argued – that the PMAA Agreement (which was executed in April 2009) had any meaningful deleterious effect on plaintiffs' ability to harvest the fruits of the Compensation Agreement for its then-existing term, which was confined to the 2009 calendar year.   All plaintiffs have offered on this front is a conclusory statement that "by its execution of the PMAA contract Defendants effectively eliminated Plaintiffs' ability to meet their contract 'obligations' under the Compensation Agreement."  (Doc. 63, at 27.)  Such unsupported statements of counsel are not evidence, and cannot properly be considered on summary judgment.  *See, e.g., Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("mere conclusions and unsupported factual allegations are legally insufficient" on summary judgment); *Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence.").

[27]     Plaintiffs do not maintain, and cannot reasonably argue, that they would be entitled to receive post-termination residuals even if they were fired for cause.  After all, the Compensation Agreement expressly provided that "[p]lan participants who are terminated for cause immediately forfeit all earned or unearned awards where permitted by law."  (Doc. 58, (Continued)

*1. Applicable Components of the "Cause" Definition.*

As framed in the Compensation Agreement, "Cause" is a many splendored thing. Nonetheless, the pertinent aspects of the "Cause" definition in that Agreement are twofold. First, in subsection (b), "Cause" is defined as "[t]he commission of any fraud … or other dishonest act that RBS Lynk and CFG has deemed a breach of Citizens' Code of Ethics … or may reasonably be expected to have injurious effect on the Company." (Doc. 58, Exh. 12, at 9.) And subsection (f) provides that "Cause" is also "[c]onduct that may reasonably be expected to have a material adverse effect on the financial interest or business reputation of the Company." (*Id.* at 10.) Defendants maintain that the circumstances in which they discharged plaintiffs satisfied both of these subsections.

*2. Defendants' Stated Reason for Discharging Plaintiffs.*

Defendants present substantial evidence that Baker, Batto and McMeekin were all fired for cause after Wright Express complained that numerous merchant application forms appeared to have been signed by the same person and an internal investigation revealed that plaintiffs had been completing and signing those applications as if they were the merchants (with no indication as to the signatory's true identity) on a routine basis.

There is no doubt that plaintiffs did sign merchants' names to Wright Express credit charge card agreement applications repeatedly, without informing or obtaining approval from Wright Express for this practice. Plaintiffs readily admit as much. Likewise, it is undisputed that when Wright Express discovered the matter and brought it to defendants' attention, Wright Express expressed profound concern to WorldPay, so much so that it no longer wanted to have

---

Exh. 12, at 9.) Nor do defendants credibly assert that any other provision of the Compensation Agreement would have foreclosed plaintiffs from receiving post-termination residual payments. As such, the only *bona fide* disputed question as to the unpaid-residuals portion of the breach of contract cause of action is whether plaintiffs were terminated "for cause." If that question is answered affirmatively, then plaintiffs can recover nothing on their breach of contract action. If, however, it is answered negatively, then defendants are liable to plaintiffs for breaching those payment obligations under the Compensation Agreement.

any dealings with plaintiff Batto (the account executive for whom the problem was first discovered) going forward.[28]

Defendants' position is that these uncontroverted facts and circumstances constitute cause for plaintiffs' termination under the Compensation Agreement, pursuant to both subsections (b) and (f).  As to subsection (b), defendants maintain that plaintiffs' conduct was a "fraud … or other dishonest act that [defendants] … deemed a breach of Citizens' Code of Ethics … or may reasonably be expected to have injurious effect on the Company."  In particular, defendants assert that it was, at a minimum, "dishonest" of plaintiffs to sign merchants' names on the Wright Express application form without specifying that plaintiffs were the ones doing the signing.  Moreover, Finnigan (the decisionmaker) made a specific determination that plaintiffs' conduct violated the Code of Ethics, and particularly sections providing that "[i]t is expected that all employees will conduct their daily activities, transactions and interactions with customers … and others with the highest standard of integrity and professionalism" and that "falsification of any record, account or document may result in immediate dismissal."  (Finnigan Dep., Exh. 2, at ¶¶ 8, 14.)  Defendants also assert that plaintiffs' dishonest acts "may reasonably be expected to

---

[28]    These expressions of dissatisfaction are understandable.  In accepting a merchant's application, Wright Express relied on the merchant's signature as confirmation of the agreement between Wright Express and merchant, of the merchant's acceptance of the terms of the Wright Express Merchant Charge Card Agreement, of the completeness and accuracy of the merchant's responses in the application, and of Wright Express's authorization to check with credit reporting agencies and other sources to confirm information contained in the application.  Thanks to plaintiffs' conduct, none of those applications had actually been signed by the merchants, leaving substantial uncertainty as to the validity and enforceability of the terms of the Wright Express Merchant Charge Card Agreement on the merchant, the right of Wright Express to contact credit reporting agencies as to the merchant, the accuracy of the application, and so on.  To be sure, plaintiffs insisted that they received oral permission from each merchant before signing the application on its behalf.  But if the merchant were later to deny having granted such authority to a plaintiff, Wright Express would potentially be left with an unenforceable agreement, pending a "he-said-she-said" quarrel concerning whether plaintiffs were in fact authorized by the merchant to sign the application.  Because of plaintiffs' actions, Wright Express's ability to enforce the terms of the Wright Express Merchant Charge Card Agreement could be compromised.  Plaintiffs created this risk for Wright Express, without Wright Express's knowledge or approval, by surreptitiously signing merchants' names to applications, all in the name of expedience and convenience.  Given these circumstances, it is hardly a surprise that Wright Express notified WorldPay that it was "quite unhappy that this had happened."  (Finnigan Dep., at 40-41.)

have injurious effect on the Company" given Wright Express's ire and the possibility of reputational injury resulting from WorldPay employees passing off their signatures as those of merchants on perhaps hundreds of legally binding documents, without ever notifying Wright Express.[29]

Much the same analysis applies under subsection (f), which provides that a termination is for cause if it is predicated on "[c]onduct that may reasonably be expected to have a material adverse effect on the financial interest or business reputation of the Company." Plaintiffs' conduct had angered a customer (Wright Express) to the point where the future of WorldPay's relationship with that entity was in jeopardy. That customer wanted nothing to do with plaintiff Batto (and presumably the other two plaintiffs as well, after their participation in the application-signing debacle was uncovered).[30] Given the harsh tenor of Wright Express's communications, the extensiveness of the falsification problem in Wright Express application forms completed by plaintiffs, and the potentially disastrous ramifications for Wright Express of plaintiffs' conduct, defendants' contention that plaintiffs' conduct could reasonably be expected to have injurious effect on WorldPay is plainly supported by record evidence.

### 3. Plaintiffs' Pretext Argument.

Plaintiffs' initial response to defendants' showing of cause for plaintiffs' termination is that the Wright Express issue was merely a sophisticated ruse, a convenient pretext devised by defendants to rid themselves of troublesome salesmen who championed the rights of customers and national account executives alike in the face of defendants' tyrannical or otherwise unethical acts. This characterization is no hyperbole. Plaintiffs state in their brief that "they were

---

[29]     Defendants' determinations in this regard are confirmed by Finnigan's testimony that "there was wrongdoing by employees that Wright Express was very unhappy with us about" and that "there was reputational damage to the company." (Finnigan Dep., at 72-73.)

[30]     As to Batto, Wright Express communicated to defendants that "they were holding all of his documentation and they didn't want any more sales applications, contracts or anything coming to him – coming to them from him." (Hunt Dep., at 53-54.) Based on these communications, defendants had internal discussions on "how to salvage the relationship with" Wright Express. (*Id.* at 184.) The magnitude of WorldPay's concern about this issue is exhibited in an email that Gary Grant sent to plaintiffs and others within days after the problem came to light, notifying the sales staff that "[b]y signing someone else's name you are … putting RBS WorldPay in major harms way and legal risk." (Doc. 58, Exh. 11.)

terminated because they complained about the unscrupulous business practices of the Defendants." (Doc. 63, at 19.)[31] According to plaintiffs, those "unscrupulous business practices" were the PMAA Agreement (which stood to lower plaintiffs' commissions) and the fractional pricing issue (which effectively increased certain merchants' bills). Plaintiffs' theory, then, is that they were fired not because Wright Express complained about application form forgeries, but because plaintiffs opposed defendants' purportedly underhanded business practices vis a vis the PMAA Agreement and fractional pricing.[32]

The fundamental flaw with this "pretext" argument is that undisputed summary judgment evidence shows that Helen Finnigan, defendants' official who actually made the termination decision, had no knowledge of the PMAA Agreement, the fractional pricing issue, or plaintiffs' complaints about either. (Finnigan Dep., at 97-98, 101-02.) If Finnigan was unaware of plaintiffs' internal complaints, she could not possibly have terminated their employment on that basis.[33] Plaintiffs have never suggested, much less offered evidence to show, that Finnigan knew

---

[31]     Elsewhere, plaintiffs argue in their brief that "Plaintiffs believe their complaints [about the PMAA Agreement] … were a real cause of their termination." (Doc. 63, at 27.)

[32]     Of course, this is not a wrongful termination case. The reason for plaintiffs' discharge matters only because if plaintiffs were terminated for cause (as defined in the Compensation Agreement), they were not entitled to post-termination residual commission payments, whereas if they were terminated without cause, they would be entitled to such payments. So, implicit in plaintiffs' theory is that firing plaintiffs for complaining about the PMAA Agreement or fractional pricing would not have been "cause" under the Compensation Agreement. Defendants have not argued on summary judgment that discharging plaintiffs on that basis would have satisfied the contractual definition of cause; therefore, the Court assumes for purposes of this analysis that if WorldPay had fired plaintiffs for complaining about unscrupulous business practices, such terminations would have been without cause and would not have diminished plaintiffs' entitlement to residual commission payments.

[33]     This common-sense principle has been recognized by the Eleventh Circuit in analogous (albeit different) circumstances in which the decisionmaker's motivation for discharging an employee is at issue. *See generally Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005) ("a decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee 'because of' that disability"); *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1156 (11th Cir. 2002) ("neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge"); *Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002) ("when we evaluate a charge of disparate treatment employment discrimination, we must focus on the actual knowledge and actions of the decision-maker"); *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1119 (Continued)

of their expressions of dissatisfaction about the PMAA Agreement and fractional pricing practices at the time she decided to terminate plaintiffs' employment.

Nor can plaintiffs circumvent the undisputed fact that Finnigan knew nothing of their internal complaints by casting her as an unwitting pawn in a scheme orchestrated by others in defendants' employ. Plaintiffs present this very theory by stating that Finnigan's "decision was highly vulnerable to manipulation and inaccuracy. She was provided a set of secondhand information that was gathered by others and presented to her in the mode and manner crafted and packaged by another." (Doc. 63, at 21.) But nothing in the summary judgment record suggests that Finnigan was a mere puppet who blindly kowtowed to a termination recommendation made by someone else. To the contrary, her testimony shows that Finnigan examined the information provided, requested and obtained additional materials, and ultimately formulated an independent decision that plaintiffs' employment should be terminated for violating the Code of Ethics. (Finnigan Dep., at 43-44, 74-76.) In short, the record evidence shows an independent decisionmaker carefully considering the information provided, as well as additional facts that she deemed appropriate, and ultimately reaching her own final decision as to plaintiffs' employment status. Plaintiffs have not made the kind of factual showing that might allow a reasonable jury to conclude that Finnigan merely rubber-stamped a termination decision made by scheming WorldPay managers who were out to get plaintiffs for their internal complaints about the PMAA Agreement and fractional pricing.[34]

_____

(11th Cir. 2001) ("It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression."). This is not a discrimination case, but the Court nonetheless finds these authorities helpful in providing a framework for examining plaintiffs' pretext theory.

[34] To borrow the vernacular from the Title VII context, plaintiffs' argument falls under the general heading of a "cat's paw theory." That theory provides that "a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct. … In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008) (citations and internal quotation marks omitted). The summary judgment record in the light most favorable to plaintiffs simply does not support a reasonable (Continued)

Nor have plaintiffs even identified the purported manipulators who they claim brought about plaintiffs' firing for internal complaints unrelated to the Wright Express issue. Certainly, there is no evidence suggesting that defendants' investigator, Donald Hunt, whose report was central to the Wright Express investigation and termination decision, had any axe to grind with plaintiffs or, indeed, any knowledge of their internal complaints prior to their termination.[35] The best that plaintiffs have mustered, then, is a shadowy accusation that someone at WorldPay wanted them fired because they objected to the PMAA Agreement and fractional pricing problems, and used the Wright Express issue as an excuse to force their terminations by somehow manipulating the investigation and decisionmaker to bring about the desired result. On this record, such an argument is wholly speculative and devoid of support. Plaintiffs cannot defeat the Motion for Summary Judgment on the strength of bald accusations untethered to record facts.

### 4. Plaintiffs' Argument that the Stated Reason is Not "Cause."

Plaintiffs also argue that there is a jury question as to whether their admitted conduct of signing merchants' names on the Wright Express applications actually constitutes "cause" within the meaning of the Compensation Agreement.

In that regard, plaintiffs maintain that "[b]ecause the Plaintiffs secured the permission of the customer, there can be no fraud, dishonesty or crime" in their conduct. (Doc. 63, at 20.) Recall that subsection (b) of the "cause" definition in the Compensation Agreement provides that a termination is for cause if it is based on the "commission of any fraud … or other dishonest act that [defendants have] deemed a breach of Citizens' Code of Ethics … or may reasonably be expected to have injurious effect on the Company." (Doc. 58, Exh. 12, at 9.) Plaintiffs say they did not commit a "dishonest act" because when they signed merchants' names on those

---

inference that Finnigan was a mere conduit for the animus of other WorldPay managers who wanted plaintiffs fired for reasons unrelated to the Wright Express mess.

[35] The uncontroverted evidence is that, prior to the WorldPay investigation, Hunt had never even met plaintiffs. (Hunt Dep., at 58-59.) Hunt testified that he personally determined the course of this investigation. (*Id.* at 125.) It is also uncontroverted that Grant never mentioned the fractional pricing / rounding issue to Hunt during his original investigation. (Hunt Dep., at Exh. 5.)

applications, they had the merchants' permission. As "dishonest" is not a defined term in the Compensation Agreement, it is properly construed according to its plain meaning. *See Chris Myers*, 991 So.2d at 1284 ("a court should give the terms of the contract their clear and plain meaning"); *Cathay Cathay*, 962 A.2d at 746 (contract language should "be given its plain, ordinary and usual meaning") (citations omitted). The plain, ordinary meaning of the term "dishonest" is "[d]isposed to lie, cheat, defraud, or deceive" or "[r]esulting from or marked by a lack of honesty." *American Heritage Dictionary of the English Language* (4th ed. 2010). Under any common-sense construction of the term, plaintiffs committed a dishonest act by signing the Wright Express applications posing as the merchants themselves, rather than as third parties signing the applications with merchants' permission.

In so concluding, the Court has fully considered plaintiffs' contention that they did nothing wrong because the merchants authorized them to sign the paperwork. This fact (which is accepted as true for summary judgment purposes) might well have removed plaintiffs' conduct from the realm of dishonesty had they undertaken to disclose that arrangement to Wright Express.[36] But it is undisputed that plaintiffs did not. Rather, they signed hundreds of Wright Express application forms (legally binding documents on which Wright Express relied as the marrow of their legal rights and obligations vis a vis each merchant's acceptance of Wright Express card services), holding themselves out not as an agent for the merchant, but as the merchant itself, without Wright Express (the recipient of those application forms) having any clue what was happening. Plaintiffs did so not for any high-minded or noble purpose, but simply to cut corners in the name of expedience. (Batto Dep., at 36; McMeekin Dep., at 104-05.)[37] It is undisputed that Wright Express had no idea that these application forms were never completed or executed by the merchants whose names and signatures purportedly appeared thereon. Thus, the

---

[36] For example, plaintiffs could have signed those applications in a format such as "Chris Baker, as agent for Merchant X," or even as "Merchant X / by C. Baker with permission," so as to place Wright Express on notice of what they were doing. Or plaintiffs could have contacted Wright Express to apprise them of their practice of signing merchant signatures to verify that they were aware of and acquiesced to such a practice.

[37] As stated in Hunt's investigative report, plaintiffs admitted "that it was done as a matter of convenience because dealing with [Wright Express] is a difficult process and the paperwork is very lengthy and cumbersome." (Doc. 58, Exh. 15, at 2.)

net effect of plaintiffs' actions was that Wright Express was deceived into thinking that the merchant had signed the application form -- and thereby accepted the terms of the agreement, authorized Wright Express to conduct credit checks, certified the veracity of the information presented, and the like -- when in fact a WorldPay salesman had completed and signed the application. The underlying merchant may never have even seen that document, and certainly did not sign it. This truth was concealed from Wright Express, in that plaintiffs never told Wright Express what they were doing, much less cleared their conduct with either Wright Express or WorldPay. When Wright Express finally discovered plaintiffs' course of conduct, its reaction was one of alarm, extreme concern, and distrust of WorldPay employees, so much so that Wright Express refused to accept documentation from plaintiffs or to allow them to participate in the remediation process. The proof of deception is in the pudding.

Given the circumstances, no reasonable fact finder could conclude that plaintiffs' admitted conduct is not firmly within the ordinary, usual meaning of the term "dishonest." Plaintiffs were holding themselves out as someone else. They were signing legal documents as someone else. The recipient of those documents had no inkling that the merchants were not the ones executing these agreements, and would never have accepted them had it known. And plaintiffs never undertook the slightest effort to notify the recipient that the legal documents in question were not really signed by the merchants whose purported signatures were on those documents. Whatever else they may be, plaintiffs' acts were unquestionably "dishonest" conduct for purposes of subsection (b) of the "cause" definition in the Compensation Agreement.

In order to constitute "cause" for purposes of subsection (b), a dishonest act must be one that WorldPay "deemed a breach of Citizens' Code of Ethics" or one that "may reasonably be expected to have injurious effect on the Company." (Doc. 58, Exh. 12.) Plaintiffs do not argue on summary judgment that these criteria are not satisfied. Nor would the record support any such contention. After all, defendants have plainly shown that, at the conclusion of the investigation, Finnigan expressly determined plaintiffs' acts to have been in breach of the Code of Ethics. That finding had a reasoned basis in fact.[38] Also, defendants have presented

---

[38]     In particular, the Code of Ethics obliged WorldPay employees to conduct business activities "with the highest standard of integrity and professionalism" and indicated that "the falsification of any record, account or document may result in immediate dismissal." (Finnigan Dep., Exh. 2 at ¶¶ 8, 14.) It was entirely reasonable for Finnigan to conclude, as she did, that (Continued)

unchallenged evidence that plaintiffs' acts had an injurious effect on WorldPay, in that Wright Express responded quite unfavorably after the truth was uncovered and WorldPay's business relationship with that entity was jeopardized.  In short, all of the criteria of subsection (b) are satisfied, and there are no genuine issues of material fact as to whether defendants had cause to terminate plaintiffs' employment for purposes of the Compensation Agreement.

The same is true under subsection (f) of the "cause" definition, which plaintiffs do not address at all on summary judgment.  That subsection provides that there is cause for plaintiffs' termination under the Compensation Agreement if they engaged in "[c]onduct that may reasonably be expected to have a material adverse effect on the financial interest or business reputation of the Company."  (Doc. 58, Exh. 12, at 10.)  This criterion is plainly satisfied here.  By falsifying hundreds of legal documents on which a WorldPay customer relied, plaintiffs' conduct sparked sentiments of extreme concern and profound dissatisfaction by that customer directed at defendants.  The record shows that defendants went into damage control mode to attempt to salvage a relationship with Wright Express.[39]  Not only did plaintiffs' conduct damage WorldPay's relationship with Wright Express, but it could reasonably be expected to have material adverse effects on defendants' relationship with countless WorldPay merchant customers whose business dealings with Wright Express were rooted in falsified (and essentially worthless) documents.  On this record, the Court cannot fathom how plaintiffs might argue that their conduct could <u>not</u> reasonably be expected to have a material adverse effect on the financial

---

defendants' acts of signing hundreds of Wright Express application forms as the merchants was a violation of both of these clauses, inasmuch as this conduct did not comport with high standards of integrity and was a falsification of documents.

[39]     If Wright Express was angry with plaintiffs and WorldPay, that anger was justified.  Because of plaintiffs' acts, Wright Express had established business relationships with hundreds of merchants, the linchpin of which was an agreement those merchants had never signed or approved in writing.  What if a dispute were to arise between Wright Express and one of its merchants?  To enforce the terms of the agreement, Wright Express would be left in the tenuous position of having to argue that a WorldPay salesman's signature pretending to be the merchant was somehow binding on the merchant through agency principles, even though the salesman never obtained written consent or authorization from the merchant to act as its agent.  Simply put, plaintiffs' conduct created legal exposure and risks for Wright Express that Wright Express never knew it had, without good reason and all for the purpose of "expediting" or cutting corners on what plaintiffs deemed a tedious application process.

interest or business reputation of defendants.  In any event, plaintiffs have never articulated such an argument, and this Court is forbidden from doing so on their behalf.  *See, e.g., Fils v. City of Aventura*, --- F.3d ----, 2011 WL 3241618, *8-9 (11th Cir. July 28, 2011) ("district courts cannot concoct or resurrect arguments neither made nor advanced by the parties," and may not "act as a plaintiff's lawyer and construct the party's theory of liability from facts never alleged, alluded to, or mentioned during the litigation").

Faced with unambiguous evidence that defendants had cause to terminate their employment under subsections (b) and (f) in the Compensation Agreement, plaintiffs' fallback position is that defendants breached the implied covenant of good faith and fair dealing.  As discussed *supra*, the covenant of good faith and fair dealing is implied in the Compensation Agreement.[40]  Plaintiffs assert that defendants violated that covenant.  According to plaintiffs, Finnigan "was missing crucial facts that made her decision unreasonable, arbitrary and capricious" and failed "to consider the true facts and endeavor to gather additional material ones." (Doc. 63, at 21.)  Plaintiffs' position is that these shortcomings "violated the Plaintiffs' right to be treated in accordance with the implied covenant of good faith and fair dealing." (*Id.* at 21-22.)

There is no genuine issue of material fact.  Uncontroverted record evidence shows that, far from acting arbitrarily and capriciously, Finnigan took her duties seriously in both examining the information providing by WorldPay's initial investigation and in requesting and receiving follow-up information that she deemed appropriate.  To be sure, Finnigan's grasp of the facts was imperfect.  She mistakenly believed that the merchants for whom plaintiff signed Wright Express applications were not defendants' clients.  (Finnigan Dep., at 45.)  And she may not have received comprehensive information concerning plaintiffs' training history at WorldPay. (Doc. 63, at 14-15.)  But neither of these mistakes undermines Finnigan's investigation or invalidates her conclusion that plaintiffs had falsified documents, seriously strained a client

---

[40]     *See, e.g., Shoney's*, 27 So.3d at 1220 n.5 ("There is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the rights of another party to receive the fruits of the contract; … in every contract there exists an implied covenant of good faith and fair dealing.") (citations omitted); *Dovenmuehle*, 790 A.2d at 1115 ("Virtually every contract contains an implied covenant of good faith and fair dealing between the parties.") (citations omitted).

relationship, and should be discharged for violation of the Code of Ethics.[41]  Upon examination

of the summary judgment record in the light most favorable to plaintiffs, no reasonable fact

finder could conclude that defendants acted in bad faith, unreasonably or arbitrarily in firing

plaintiffs for violation of the Code of Ethics based on the Wright Express fiasco.  All record

evidence confirms that defendants conducted their investigation and made their termination

decision in a manner that was fully consistent with the covenant of good faith and fair dealing

implicit in the Compensation Agreement.[42]

---

[41]    Plaintiffs argue that the merchant relationship issue is a "crucial" fact that had a "pervasive and corrosive effect on her decision making process."  (Doc. 63, at 12.)  Neither the record nor common sense support such a reading.  For starters, Finnigan never testified that she would not have fired plaintiffs had she known that the merchants were defendants' customers too.  Furthermore, any such statement would be most curious.  Regardless of how the merchants felt about the issue, or whether the merchants were WorldPay clients, the fact remains that Wright Express was also a WorldPay client, that Wright Express was actually deceived by (and quite unhappy as a result of) plaintiffs' behavior, and that defendants had good reason to be concerned about the health of their relationship with Wright Express.  (Finnigan Dep., at 58, 72-73.)  Contrary to plaintiffs' argument, the nature of the relationship between defendants and the merchants was not particularly relevant or important.  Whatever that relationship was, plaintiffs were deceiving Wright Express by holding themselves out as the merchant itself in executing the Wright Express application form.  And even if the merchants were thrilled with plaintiffs' conduct, Wright Express (also a client of defendants) most decidedly was not, and Wright Express's dissatisfaction is what drove defendants' investigation and Finnigan's conclusions.  In short, plaintiffs attach far greater significance to Finnigan's misapprehension of the merchants' customer relationship to WorldPay than logic or the underlying facts can support.  As for the training issue, defendants' evidence is that all three plaintiffs had received the Code of Ethics and that at least Baker and Batto had been trained on it.  (Finnigan Dep., at Exh. 4.)  McMeekin appears to admit in his deposition that he had also received online training on the Code of Ethics.  (McMeekin Dep., at 85.)  Plaintiffs proffer no evidence of any kind that they had not received such training or that they were unaware of the Code of Ethics.  As such, this objection is much ado about nothing.  Plaintiffs cannot create a genuine issue of material fact by engaging in idle speculation and vague innuendo about facts that lie squarely within their possession or control, but that they have elected not to present on summary judgment.

[42]    One final point bears noting.  A recurring theme in plaintiffs' brief is that, by signing merchants' names on WorldPay applications, they were only doing what they had been trained to do.  This assertion does not survive scrutiny.  Plaintiff Baker testified that he could not name anyone at defendants' predecessor entity who ever said it was okay to sign the customer's name on a contract, because the subject was simply "never discussed or never brought up." (Baker Dep., at 37-39.)  Plaintiff Batto acknowledged that no one ever instructed him not to have the merchant sign the contract.  (Batto Dep., at 37.)  And plaintiff McMeekin indicated that he could not recall any conversation in which he was ever authorized by his employer to complete (Continued)

For all of these reasons, plaintiffs' breach of contract claim cannot survive summary judgment scrutiny. In the light most favorable to plaintiffs, the record evidence shows that defendants properly terminated their employment for cause, as that term is defined in the Compensation Agreement, thereby cutting off their right to post-termination residual commission payments. As such, defendants are not in breach of the Compensation Agreement by not paying those residuals, and plaintiffs' breach of contract claim to the contrary is due to be **dismissed** on summary judgment.

### C.  *Conversion and Unjust Enrichment Claims.*

Plaintiffs did not confine their Complaint to a breach of contract cause of action. Rather, they theorized that, in addition to breaching the Compensation Agreement, defendants' conduct of withholding residual commission payments owed to plaintiffs amounts to conversion and unjust enrichment under applicable law.

Both the conversion and the unjust enrichment claims require plaintiffs to show that defendants are in possession of money or property that rightfully belongs to plaintiffs. *See, e.g., SouthTrust Bank v. Donely*, 925 So.2d 934, 939 (Ala. 2005) ("To establish conversion, one must present proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property.") (citations omitted); *Cassels v. Pal*, 791 So.2d 947, 953 (Ala. 2001) ("Essential to a conversion would be some wrongful taking, wrongful retention, or misapplication of specifically identifiable personalty."); *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So.3d 1185, 1193 (Ala. 2008) ("To succeed on a claim of unjust enrichment, the plaintiff must show that … the

-----

an application form or contract as if he were the customer. (McMeekin Dep., at 100-02, 108.) Rather, plaintiffs' evidence is that this was "just accepted" conduct, in some amorphous, inchoate and ill-defined way. (Id. at 105.) There is absolutely no evidence that defendants ever sanctioned, authorized, or approved such conduct by plaintiffs or anyone else. At best, plaintiffs' evidence is that they signed the merchants' names on Wright Express applications simply because it was expedient and it was what they had always done. Such a fact, even accepted as true, does not excuse plaintiffs' violation of the Code of Ethics or undo the injury their conduct worked on the business reputation and financial interests of WorldPay, so the "for cause" nature of their termination remains intact even if plaintiffs were signing merchants' names to Wright Express contracts in blind reliance on the "way things had always been done" at the predecessor entity to WorldPay.

defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud.") (citations and internal quotation marks omitted).  Because defendants properly designated plaintiffs' termination as being "for cause" under the Compensation Agreement, defendants do not possess any funds that properly belong to plaintiffs as unpaid residual commissions.  Inasmuch as defendants are neither wrongfully detaining property belonging to plaintiffs, nor holding money which in equity and good conscience belongs to plaintiffs, the conversion and unjust enrichment claims fail as a matter of law.

**IV.    Conclusion.**

For all of the foregoing reasons, Defendants' Motion for Summary Judgment (doc. 56) is **granted**, and this action is **dismissed with prejudice**.  A separate judgment will enter.

DONE and ORDERED this 4th day of October, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE